UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

        Plaintiff,

    - v -                      07 CR 225-01 (KMK)

CHARLES WELLS,

        Defendant.

_____

## SENTENCING MEMORANDUM OF CHARLES WELLS

DUANE MORRIS LLP
Gregory P. Gulia
Joseph M. Burton (*pro hac vice*)
1540 Broadway
New York, New York 10036-4086
Phone: (212) 692-1000
Fax: (212) 692-1020

*Attorneys for Defendant Charles Wells*

I.  **INTRODUCTION**

Defendant Charles Wells (hereinafter "Mr. Wells" or "Wells"), by and through his undersigned attorneys, respectfully submits the following Sentencing Memorandum for the Court's consideration.

In March of 2007 Mr. Wells began cooperating with the United States Attorney's Office and the federal agents assisting them in their investigation of a massive bank fraud scheme. Pursuant to a plea and cooperation agreement, Wells waived indictment, and on March 22, 2007, plead guilty to one count of bank fraud in violation of 18 U.S.C. §§ 1344 and 2. Mr. Wells continued to cooperate, meeting with the government on several occasions. On April 18th and 19th of 2007, Wells testified at the trial of several of the scheme's conspirators.

Mr. Wells now appears before this Court for sentencing. Based upon the factors discussed in this Memorandum, Mr. Wells requests that the Court impose a sentence which does not include a term of imprisonment.

Wells respectfully submits that such a sentence is fair, appropriate and just in light of (1) the nature and extent of his involvement in the bank fraud; (2) his background and character, and the resultant certainty that he will not replicate his prior conduct; (3) the significant collateral consequences to his reputation, standing, and business prospects, which he has suffered as a result of being charged with and convicted of fraud; and (4) the nature, extent and value of his assistance to the government in the prosecution of the underlying fraud scheme.

II.  **DETERMINATION OF THE APPROPRIATE SENTENCE**

In two very recent decisions, the Supreme Court has made clear that District Courts have the discretion and the duty to impose a sentence which may or may not conform to that suggested under the Sentencing Guidelines, but which must comport with the dictates of 18 U.S.C. § 3553. See *Gall v. United States*, ____ U.S. ____, 128 S. Ct. 586 (2007); *Kimbrough v. United States*, ____ U.S. ____, 128 S. Ct. 558 (2007). A court must impose a sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing, including retribution, deterrence, and rehabilitation. See, 18 U.S.C. § 3553(a).

In *Gall*, the Court set out a practical and useful series of steps for the district courts to follow in sentencing a defendant:

> (1) "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, *the Guidelines should be the starting point and the initial benchmark*. The Guidelines are not the only consideration, however." *Id*. ____ U.S. at ____, 128 S. Ct. at 596. (emphasis added)
>
> (2) "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. *In so doing, he may not presume that the Guidelines range is reasonable* . . . He must make an individualized assessment based on the facts presented." *Id*. ____U.S. at ____, 128 S. Ct. at 596-97. (emphasis added)
>
> (3) "If [the district court] decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id*. ____ U.S. at ____, 128 S. Ct. at 597.
>
> (4) "After settling on the appropriate sentence, [the district court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id*.

In a concurring opinion in the Kimbrough case Justice Scalia noted that:

> . . . the district court is free to make its own reasonable application of the § 3553(a) factors, *and to reject (after due consideration) the advice of the Guidelines*. If there is any thumb on the scales; if the Guidelines must be followed even where the district court's application of the § 3553(a) factors is entirely reasonable; then the "advisory" Guidelines would, over a large expanse of their application, entitle the defendant to a lesser sentence but for the presence of certain additional facts found by judge rather than jury. This, as we said in *Booker*, would violate the Sixth Amendment.
> *Id*. ____ U.S. at ____, 128 S. Ct. at 576 (Scalia, J., Concurring).

The factors to be considered in imposing sentence are well known by this Court and are set forth in 18 U.S.C. 3553(a):

    (1)    The nature and circumstances of the offense and the history and characteristics of the defendant;

3

(2) The need for the sentence imposed - -

    (A). to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed education for vocational training, medical care or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date the sentence is imposed;

(5) Any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in effect on the date the defendant is sentenced;

(6) The need to avoid unwarranted sentence disparity among defendants with similar records who have been guilty of similar conduct; and

(7) The need to provide restitution to the victims of the offense.

We address these factors in this Memorandum.

### A. **The Nature and Circumstances of the Offense.**

    (1). <u>Mr. Wells' Actions</u>.

Wells testified that his involvement in this matter began in the Spring of 2005, approximately one week before he was scheduled to travel to Martinique for an international track & field meet. At this time, he received a telephone call from Timothy Montgomery.

4

Montgomery advised Wells that he (Montgomery) had been doing public relations work for a "rich guy in Florida" and that Montgomery would be sending Wells a check to deposit for the work he (Montgomery) had done. (Trial Transcript Excerpt Exhibit A.) Wells, who was at the time Montgomery's agent, had not arranged such a PR deal for Montgomery, and he was not aware of such an opportunity being available for Montgomery because of his involvement in the BALCO doping scandal. Wells questioned Montgomery about the deal but Montgomery gave him little additional information.

Several days later, Wells received, by way of a Federal Express package, a check made out to Vector Sports Management in the amount of $575,000. (Trial Transcript Excerpt Exhibit B.) Wells called Montgomery and advised him that a check had arrived. After a brief conversation in which Montgomery exhibited a surprising lack of basic information about the check, Wells made arrangements to deposit the check in a business account at Wells Fargo Bank which Vector Sports Management used to hold and disburse its athlete's funds. Wells caused the check to be deposited despite believing that the check was likely fraudulent. He decided to do so "because I was really accommodating him, trying to keep my relations with my top athlete (Marion Jones)." (Trial Transcript Excerpt Exhibits B and C.)

The day after this check was deposited, Wells left for Martinique where both Montgomery and Marion Jones would be running in the meet. While in Martinique, Wells saw Montgomery and advised him that he had deposited the check and that it "looked good." Wells further advised Montgomery that he expected that it would take four to five business days for the check to clear.

After Wells returned from the Martinique track meet he learned that the check had in fact not cleared. Wells called Montgomery and advised him of this development. Montgomery expressed surprise and promised to check on it. (Trial Transcript Excerpt Exhibit D.) Approximately one week later Wells spoke to Montgomery by phone and Montgomery advised him that he would be sending Wells a second check. Shortly after this telephone conversation, Wells received a check again made out to Vector Sports Management but in the amount of

5

$550,000. Wells again called Montgomery to advise him that he had received another check. During this telephone conversation Montgomery asked Wells if he had an account with Wachovia Bank. Montgomery asserted that if the check were deposited in a Wachovia Bank that "it will work." Wells advised Montgomery that he did not have a Wachovia account and that he would not open such an account in order to deposit the check. Wells deposited this second check into a non-business account at Washington Mutual Bank. He did so because he believed that this check was also likely fraudulent and he did not want to risk having a second returned check at his principle business account. (Trial Transcript Excerpt Exhibit E.) As Wells anticipated, this second check also failed to clear.

        (2).    Mr. Wells' Degree of Participation.

Mr. Wells' participation, is, we believe, fairly defined as "minimal." Under the Sentencing Guidelines, minimal participants are those "who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." (*Federal Sentencing Guidelines*, section 3B1.2, Note 4.) While Wells' deposit of the two bogus checks was the final act in a long series of acts aimed at defrauding various banks, the over-arching scheme was totally unknown to Wells. There is absolutely no evidence that Wells was aware that he had become an unwitting participant in a wide-ranging scheme to defraud.

Mr. Wells' degree of participation in the over-arching scheme to defraud represents a key differentiator between him and the other defendants who have been sentenced before this Court. His role as a relatively insignificant, nonessential participant is consistent with a sentence far less severe than the 33 to 41 months called for by the Guidelines.

        (3).    Mr. Wells' Motivation.

Wells does not dispute that his actions, however minor, constitute bank fraud. By deciding to deposit checks which he believed, based on all the information known to him, were likely fraudulent, Wells possessed the requisite mental state needed to establish a bank fraud.

6

Wells has admitted this violation and has accepted responsibility for it by pleading guilty. During cross-examination by defense counsel he was asked the following:

> Q. You didn't choose to go to trial because in your mind when you deposited those checks even though no one said to you these are fraudulent, you believed them to be fraudulent, right?
>
> A. Correct.

[Trial Transcript Excerpt Exhibit F.]

Thus, while it is clear that Wells possessed the state of mind necessary to commit the offense of bank fraud, the facts also establish other factors relevant to the determination of an appropriate punishment for his actions.

First it is clear that Wells did not act with the purpose of stealing funds from a bank, or anyone else. Nor was Wells' motivation for depositing the checks premised on personal gain. While Wells knew that as a matter of the usual business arrangement between he and Montgomery, he would receive a percentage of any monies earned by Montgomery, this was not a fact which motivated him to deposit the checks:

> BY MS. PERRY:
> Q. You were asked a number of questions about your motivations in depositing these checks. Do you recall that?
> A. Correct.
> Q. You have testified specifically about the leverage that Mr. Montgomery had over you?
> A. Right.
> Q. Were there any additional reasons, any personal reasons that you also deposited the check?
> A. No.
> Q. Did you receive any money from the check?
> A. No.
> Q. Did you hope to?
> A. Not really.
> Q. Well, did you discuss with Tim Montgomery any [sic] any point what money you would make off of the checks?
> A. I usually get my percent.

7

> Q. Did you discuss that with Mr. Montgomery?
> A. Yes.
> Q. And were you hoping you would get a percent?
> A. Yes.

[Trial Transcript Excerpt Exhibit G.]

Rather, Mr. Wells acted out of a misguided and wrong-headed desire to appease Montgomery in order to avoid disrupting his business relationship with his top athlete, Marion Jones. Perhaps the best explanation of Mr. Wells' motivation and actions came at trial during a portion of his cross-examination by the attorney for defendant Nathaniel Alexander:

> Q. And then lo and behold in 2004 and 2005 while Mr. Montgomery is kind of enduring the humility, if you will, of that fall, he comes to you with these checks, yes?
> A. Correct.
> Q. And as I understand the testimony, he never once said to you this is a bogus check, did he?
> A. Correct?
> Q. He lied to you, yes?
> A. Correct.
> Q. It may be a lie that in retrospect you don't believe, didn't believe at the time, but nonetheless it was a lie is that true?
> A. Correct.
> Q. And he got you to commit ultimately, I guess, the crime you pled guilty to, is that right?
> A. Correct.
> **Q. And you stand here or come before this jury now as someone who has pled guilty to federal bank fraud felony because of what Mr. Montgomery got you to do, correct?**
> **A. Correct.**
> **Q. And it really wasn't that you were doing a friend a favor for Mr. Montgomery, was it?**
> **A. No.**
> **Q. It really was in order for you to maintain a relationship with him in order to maintain a relationship with Ms. Jones, yes?**
> **A. More with Ms. Jones.**
> **Q. In other words, you didn't want to alienate the two of them because you were fearful you would lose one of your best clients?**
> **A. I was fearful of losing Marion Jones.**
> Q. That would be the person -- one of your best clients, correct?
> A. Yes.
> Q. So Mr. Montgomery had some leverage on you, didn't he?

8

>A.  Yeah, he had leverage.
>Q.  You said something the other day about or yesterday about a track meet and that you said I think on direct examination, I had to use Marion to get him into the meet?
>A.  Correct.
>Q.  I think I understand what that means, but whether or not an athlete shows up to a particular event is up to the athlete ultimately, right?
>A.  Correct.  And the coach.
>Q.  I am not a track and field person.  It might be obvious but I am not much of a runner or even a walker in the courtroom.  Golf is kind if my thing.
>    Tournaments, you know when a golf tournament has Tiger Woods in it, the ratings go up, the sponsorship goes up, everybody makes more money.
>    Is that the same thing in track and field, if Marion Jones showed up to a track and field event that made the event more prestigious and it gave everybody a little bit more money?
>A.  Correct.
>Q.  So if Marion Jones decides to go to this event and not that event, the event she decides to go to are happy, thrilled; the event she decides not to go to, not so happy?
>A.  Correct.
>Q.  When you say you used Marion Jones, the event that you were speaking about, what was that?
>A.  Martinique.
>Q.  That event they didn't really want Montgomery, did they?
>A.  Correct.
>Q.  You had to say to them, this is a two-fer, you want Marion Jones, you got to take Montgomery?
>A.  Correct.
>Q.  And what did they do?
>A.  They accepted him.
>**Q.  And in the same way, Montgomery got you to deposit these checks because of your relationship and your desire to maintain a relationship with Marion Jones, is that true?**
>**A.  Correct.**

[Trial Transcript Excerpt Exhibit H.]  [Emphasis Added]

While neither a justification for his crime, nor a commendable reason, Mr. Wells' motivations are best understood in the context of basic human frailty.  Mr. Wells knows that he should have acted with greater fortitude and clarity of purpose.  While he should be, and is being, punished for his weakness and lapse of judgment, he should be treated with some leniency

because he did not act with malice, ill will, or with a purpose to defraud or otherwise harm anyone or any entity.

    (4). <u>Wells' Background and Character</u>.

  Mr. Wells has no prior record of criminal conduct of any kind. He has never been arrested nor convicted of any criminal offense. He has never been accused of any other form of misconduct. He has led an exemplary life, and until this incident was a highly respected athlete representative and member of USATF.

  Wells graduated from Arizona State University in 1980. While at Arizona State he was a four time All American Track Athlete. Subsequent to his graduation, he has been able to turn his prowess on the track into equal excellence in the field of sports management and marketing. Since the founding of his company in 1989, Wells has excelled to the point where he had become well known, and was recognized as one of the foremost agents and managers of athletes in the sports world.

  During his long career, Wells has made a number of significant contributions to the betterment of USA Track & Field, and the sport. Wells was one of the original members of the Agent Steering Committee. He was also a founding member of the Association of Athletics Managers (AAM) and sat on its executive board. Over the last several years he had consistently ranked among the top five athlete representatives in terms of the number of athletes he has represented and perceived stature of many of those athletes. Perhaps most importantly, Wells has helped to raise the stature and recognition of female sprinters as a result of his efforts to obtain significant endorsement opportunities for female sprinters, as well as being able to obtain significantly larger appearance fees for female sprinters.

  **B.** <u>**The Need To Reflect The Seriousness Of The Offense.**</u>

  Bank fraud is clearly a serious offense. However, the actions constituting the fraud offense to which Mr. Wells pled are, for purposes of determining an appropriate sentence, less serious than many other cases because, as discussed earlier, Wells had a very small and attenuated role in the underlying bank fraud scheme.

The *Gall* case is itself a reminder that while an offense may be considered to be inherently serious, the particular facts of the defendant's involvement in the offense may be sufficient to justify a sentence much more lenient than would be suggested by the general nature of the offense. Gall was charged along with several other individuals with participating in a conspiracy to distribute ecstasy, cocaine, and marijuana. The Pre-Sentence Report recommended a sentencing range of 30 to 37 months of imprisonment.

Because of a number of factors including the fact that Gall had withdrawn from the conspiracy at a relatively early stage, the district court imposed a sentence of probation. In upholding the district court's probationary sentence, the Supreme Court stated:

> "The government's legitimate concern that a lenient sentence for a serious offence threatens to promote disrespect for the law is at least by some extent offset by the fact that 7 of the 8 defendants in this case have been sentenced to significant prison terms. Moreover, the unique facts of Gall's situation provides support for the district judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Id.*, _____ U.S. at ____, 128 S. Ct. at 599.

Wells submits that similar reasoning is applicable in this case.

Further, Wells' activities resulted in *no* actual loss. Under the facts of this case, the use of the concept of "intended loss" has significantly and unfairly skewed the Sentencing Guidelines calculation.

### C.     The Need To Deter Criminal Conduct And Protect The Public.

In considering this factor, the Court may consider the significant collateral consequences that Mr. Wells has endured and will continue to endure.

In this case, after news of his involvement in this matter became public, Wells was essentially "black-balled" in his profession. He has suffered a serious loss of business opportunities because some potential clients (and their parents) have been reluctant to work with

11

him because of a lack of understanding of his circumstances, and/or of because of misinformation disseminated by his peers and competitors.

More importantly, on November 2, 2007 USA Track & Field (USATF), one of the bodies which licenses Mr. Wells as an authorized representative, suspended his license for two years (until March 26, 2009). At the end of the two year period, Mr. Wells' reinstatement as a licensed athlete representative is not automatic. He may reapply, and the USATF may accept the application, accept the application with conditions, reject the application, or call for further information.

In light of these circumstances, Wells' ability to work in his chosen profession has been significantly impacted. Collateral consequences like these act as a significant deterrent to future criminal conduct by those who have been convicted of offenses, and the Court may properly consider these consequences as a basis for imposing a more lenient sentence. See *United States v. Gaind*, *829 F. Supp. 669, 671* (S.D.N.Y. 1993), Aff'd 31 F. 3d 73(2nd Cir. 1994) (under the Sentencing Guidelines, the Court allowed for a downward departure from the Guidelines because "elimination of the defendant's ability to engage in similar or related activities - or indeed any major business activity - for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was attempted to undertake, and constitutes both individual and general deterrents.)

      **D.**      **The Kinds Of Sentences Available.**

Because 18 U.S.C. § 1344 is a Class B felony, probation is not a sentence that this Court may impose. Were probation available, Mr. Wells would urge this Court to impose an appropriate probationary sentence in light of all of the sentencing factors which the Court must consider.

Therefore, this Court may, *though it is not required to do so*, and we urge the Court not to, sentence Mr. Wells to a term of imprisonment. If the Court imposes a term of imprisonment, it also may provide that the defendant be placed on a term of supervised release after

imprisonment. Moreover, a term of imprisonment may be satisfied through utilization of substitute confinement such as community or home detention.

### E. The Sentencing Range Established By The Sentencing Guidelines.

Wells does not object to the Guidelines calculation set forth in the Presentence Report. However, we again note that this calculated offense level is only advisory. More importantly, Wells reminds the Court that the sentencing level was reached without benefit of the government's 5K.1 recommendation.

Wells anticipates that the government, pursuant to the plea and cooperation agreement, will make a downward departure motion under Section 5K based on Wells' substantial assistance. In light of this assistance Wells further anticipates that his final offense level under the Sentencing Guidelines should be within Zone C or Zone B.

**III.    CONCLUSION**

Mr. Wells has been sincere in his remorse and acceptance of responsibility. His substantial assistance to the authorities has been frequent, and continuous. His acceptance of responsibility has been extraordinary. Well's criminal conduct constitutes uncharacteristic behavior in an otherwise exemplary life. When taking into account the reasons that confinement is usually imposed, the minimal impact to the victim, and Well's personal background and character, this Court may fairly and reasonably conclude that a sentence which includes imprisonment is neither appropriate or necessary.

For all the foregoing reasons, Wells respectfully requests that the Court impose a sentence that does not include a term of imprisonment.

DATED:  San Francisco, California
        February 20, 2008

DUANE MORRIS LLP

By:    s/ Joseph M. Burton
    Gregory P. Gulia (GG 4215)
    Joseph M. Burton (*pro hac vice*)
    1540 Broadway Avenue
    New York, New York 10036-4086
    (212) 692-1000

## **CERTIFICATE OF SERVICE**

  I hereby certify that on February 20, 2008, I electronically filed the foregoing Sentencing Memorandum of Charles Wells using the CM/ECF system, which sent notification of such filing to the following:

| | |
|---|---|
| E. Danya Perry | danya.perry@usdoj.gov |
| Daniel Walter Levy | daniel.levy@usdoj.gov |

                        s/ Lea A. Chase
                         Lea A. Chase

DM1\1292657.1