# TRIAL TRANSCRIPT EXCERPT EXHIBIT A

894

74IJMON4                 Wells - direct

1   A.  No.

2   Q.  Why did you do it?

3   A.  Well, I was really doing a favor for him because I was

4   protecting my interests with my top athlete.

5   Q.  Who was that?

6   A.  Marion Jones.

7   Q.  Did you know it was wrong to do that?

8   A.  Yes.

9   Q.  Did there come a time in the Spring of 2005 when you had a

10  conversation with Tim Montgomery about a large check?

11  A.  Yes.

12  Q.  Were you speaking with him live, in person, or was this a

13  phone conversation?

14  A.  On the phone.

15  Q.  Where were you?

16  A.  I was in Texas.

17  Q.  Do you know where he was?

18  A.  No.

19  Q.  Do you know approximately when this conversation was?

20  A.  It was about a week before we went to Martinique.

21  Q.  What were you going to Martinique for?

22  A.  For international track and field meeting.

23  Q.  Where is Martinique?

24  A.  The French Caribbean.

25  Q.  Whose was to be traveling to Martinique?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

895

74IJMON4          Wells - direct

1  A. Myself, Marion Jones, Tim Montgomery and Coach Riddick.
2  Q. Were there others there as well?
3  A. Yes, some other athletes.
4  Q. Mr. Montgomery was going to be racing in Martinique?
5  A. Yes.
6  Q. Did he participate in a lot of meets in 2005?
7  A. No. I had a hard time getting him in meets. As a matter
8  of fact, I had to use Marion Jones to get him in this
9  particular meet.
10  Q. When you had this conversation with Mr. Montgomery, what
11  did he tell you?
12  A. He told me he was doing PR work for some rich guy in
13  Florida and he'll be sending me a check.
14  Q. Did he tell you this was for PR work he had already done or
15  which he had yet to do?
16  A. Which he has already done.
17  Q. Did he tell you anything more about what type of PR work he
18  had already done?
19  A. No. I asked him. He didn't tell me.
20  Q. Did he tell you how much the check was going to be for?
21  A. No.
22  Q. Did you ask him that question?
23  A. Yes.
24  Q. And he wouldn't tell you?
25  A. No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# TRIAL TRANSCRIPT EXCERPT EXHIBIT B

896

74IJMON4          Wells - direct

1  Q.  Did you ask him who the rich guy was?
2  A.  Yes.
3  Q.  Did he tell you?
4  A.  No.
5  Q.  Did you ask him if he had any paperwork about this?
6  A.  Yes.
7  Q.  What did he tell you?
8  A.  He said he is supposed to send it to me, but he never did.
9  Q.  From the time that Mr. Montgomery was under investigation
10  in the Balco scandal, were you aware of any PR deals in which
11  Mr. Montgomery was involved?
12  A.  No.
13  Q.  Were you aware of any business deals whatsoever he was
14  involved with?
15  A.  No.
16  Q.  Are you aware of any speaking engagements he had?
17  A.  No.
18  Q.  As his agent, would you have been aware of any such deals?
19  A.  Yes.
20  Q.  Did you believe that Mr. Montgomery had really been doing
21  PR work?
22  A.  No.
23  Q.  What was the next thing that happened with respect to this
24  check that he described to you.
25  A.  Well, I wound up receiving the check.  Once I received the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

897

74IJMON4          Wells - direct

1  check, I immediately called Mr. Montgomery.
2  Q. How did you receive this check?
3  A. By Fed Ex.
4  Q. I show you a few exhibits. How much was that check for?
5  A. $575,000.00.
6  Q. Do you recognize Government Exhibit 63?
7  A. Yes.
8  Q. What is that?
9  A. It's the Fed Ex bill.
10 Q. Containing the check?
11 A. Yes.
12 Q. It arrived at your business, Vector Sports?
13 A. Yes.
14       MS. PERRY: The government offers Government Exhibit
15 63.
16       THE COURT: Any objections?
17       MR. HOSS: No.
18       THE COURT: Government Exhibit 63 is received.
19       (Government Exhibit 63 received in evidence)
20 BY MS. PERRY:
21 Q. Where does the Fed Ex bill state that it's from, the
22 package is from?
23 A. Brooklyn, New York.
24 Q. Can you read the address on there, the street address?
25 A. 1129 -- looks like Easter Parkway.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

898

74IJMON4            Wells - direct

1  Q.  Do you see the sender's name there?
2  A.  Yes, H. Smith.
3  Q.  Does it say what date this check was sent?
4  A.  Yeah, 4-25.
5  Q.  2005?
6  A.  2005.
7  Q.  Turn to Government Exhibit 60 A.  Do you recognize that
8  exhibit?
9  A.  Yes, I do.
10  Q.  What is that?
11  A.  This is a check I received from Tim Montgomery.
12  Q.  Via the Fed Ex that is Government Exhibit 63, is this the
13  check that you received in that package?
14  A.  Yes.
15     MS. PERRY:  The government offers Government Exhibit
16  60 A.
17     THE COURT:  Any objections?  60 A is received.
18     (Government Exhibit 60 A received in evidence)
19  BY MS. PERRY:
20  Q.  Who is the issuer of this check?
21  A.  American Express Travel Related Service.
22  Q.  Who is it made out to?
23  A.  It is made out to Vector Sports Management.
24  Q.  What was your reaction when you received this check?
25  A.  When I received this check, I believed it was fraud.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899

74IJMON4                Wells - direct

1   Q.  What did you do?
2   A.  Basically what I did with this check, I deposited the
3   check.
4   Q.  Did you speak with Mr. Montgomery before depositing the
5   check?
6   A.  Yes.
7   Q.  What did you say to him?
8   A.  I told Tim that I received this check and I asked him what
9   was this for, for the check.  He told me it was for PR work.
10  Q.  What was the tone of his voice when he told you it was for
11  PR work?
12  A.  Sarcastic.
13  Q.  Did he ask you any questions about the check?
14  A.  Yeah, which was kind of unique.  He asked me who was the
15  check issued on.
16  Q.  Who was the maker of the check?
17  A.  The maker of the check.
18  Q.  What did you tell him?
19  A.  I told him American Express Travel.
20  Q.  Did he ask you any more questions about the check?
21  A.  The other thing he asked me was how much was the check.
22  Q.  What did you tell him?
23  A.  I told him how much the check was.
24  Q.  What was his reaction when you told him the amount of the
25  check?

# TRIAL TRANSCRIPT EXCERPT EXHIBIT C

900

74IJMON4                Wells - direct

1   A. He said, "Great!"
2   Q. Did he tell you what he wanted you to do with this check?
3   A. Yes.  Basically he told me when the check clears, buy him
4   something.
5   Q. Did he tell you at that point what he wanted you to buy
6   him?
7   A. No.
8   Q. Did you discuss anything about your cut?
9   A. Yes.  Basically also he said go by yourself something, he
10  said that buy me something when the check clears and then you
11  cab keep the rest.
12  Q. Had you ever had occasion to deposit such a large check
13  before on behalf of any athlete?
14  A. Not this large.
15  Q. Was your deposit anything even close?
16  A. No.
17  Q. What did you do with this check after you spoke to
18  Mr. Montgomery?
19  A. I deposited it into my Wells Fargo account.
20  Q. You did that despite believing it was a fraudulent check?
21  A. Yes.
22  Q. Why did you do that?
23  A. Because I was really accommodating him, trying to keep my
24  relations with my top athlete.
25  Q. Is that Marion Jones?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

905

74IJMON4          Wells - direct

1   A. Yes.
2   Q. What is Government Exhibit 60?
3   A. This is my Wells Fargo business account.
4   Q. For Vector Sports?
5   A. For Vector Sports.
6   Q. Is this the account into which this 575,000-dollar check
7   was deposited?
8   A. Yes.
9       MS. PERRY: Government offers government 60.
10      THE COURT: Any objection?
11      MR. KELLEHER: 62?
12      THE COURT: 60.
13      No objection?
14      62 is in. This is 60.
15      Any objection?
16      MR. KELLEHER: No.
17      MR. HOSS: No.
18      THE COURT: 60 is received.
19      (Government's Exhibit 60 received in evidence)
20  BY MS. PERRY:
21  Q. When was the next time that you saw Tim Montgomery or that
22  you spoke with Tim Montgomery after depositing these checks?
23  A. The next time I spoke to Tim or seen Tim Montgomery was in
24  Martinique.
25  Q. When was that with respect to this check?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

906

74IJMON4                    Wells - direct

1   A.  It was on the 27th.
2   Q.  It was the following day?
3   A.  Yes.
4   Q.  How long were in Martinique?
5   A.  We was there until about -- three or four days.
6   Q.  And this was for the purpose of track meet?
7   A.  Track meet.
8   Q.  And Mr. Montgomery was there?
9   A.  Yes.
10  Q.  And Mr. Riddick as well?
11  A.  Yes.
12  Q.  Did you talk to Mr. Montgomery at that time about the
13  check?
14  A.  Yes, I did.
15  Q.  What did you tell him?
16  A.  I talked to him and I told him that I deposited the check
17  and I also told him that it will take four to five -- four to
18  ten business days for the check to clear and I told him the
19  check looked good.
20  Q.  What did you mean when you told him that the check looked
21  good?
22  A.  As the check looks real.
23  Q.  What was his reaction?
24  A.  He was happy.
25  Q.  Did Mr. Montgomery tell you about any additional checks he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# TRIAL TRANSCRIPT EXCERPT EXHIBIT D

912

74IJMON4                Wells - direct

1    A.  I immediately called Tim Montgomery.

2    Q.  And what did you tell him?

3    A.  I told him that the check was returned.

4    Q.  Did you tell him why it was returned?

5    A.  Yes.

6    Q.  What did he say?

7    A.  He said he will check on it.

8    Q.  Did you have any further discussions with him about any

9    other additional checks?

10   A.  Yes, I did.

11   Q.  When was this further discussion?

12   A.  It was about a week later.

13   Q.  What did he tell you about an additional check?

14   A.  He will be sending me another check.

15   Q.  Did you in fact receive an additional check?

16   A.  Yes.

17   Q.  Do you recall how much that check was that you received?

18   A.  Yes.

19   Q.  How much was that?

20   A.  $550,000.

21       MS. PERRY:  May I approach, your Honor?

22       THE COURT:  Yes.

23   Q.  Do you recognize Government Exhibit 65A?

24   A.  Yes, I do.

25   Q.  What is that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# TRIAL TRANSCRIPT EXCERPT EXHIBIT E

916

74IJMON4                    Wells - direct
1   how much was the check.
2   Q. Did you tell him those answers?
3   A. Yes.
4   Q. Did he say anything to you about where to deposit the
5   check?
6   A. Yes.
7   Q. What did he say?
8   A. He told me -- he asked me do you have a bank Wachovia
9   around the area, and I told him I probably do.
10  Q. And did he tell you why he asked you that question?
11  A. Yes. Because he -- his next statement was that if you have
12  a Wachovia account, it will work.
13  Q. And did you tell him that you would deposit it in a
14  Wachovia bank?
15  A. No.
16  Q. Where in fact did you deposit the check?
17  A. Into my Washington Mutual account.
18  Q. And this is a different account that you had deposited the
19  first check?
20  A. Yes.
21  Q. Why did you deposit it at a different account?
22  A. Because I have a -- I have been banking at Wells Fargo and
23  already have one check returned from them, and I didn't want to
24  have another one returned. I wanted to keep my relationship
25  with them.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

917

74IJMON4            Wells - direct

1  Q. What type of account did you have at Washington Mutual?

2  A. It was just a -- it was just a small account that I opened

3  when I had opened my line of credit. It was an account that I

4  never used a lot.

5  Q. Did you have any funds in that account?

6  A. About a dollar, $2.

7  Q. You didn't want to jeopardize your funds in the Vector

8  Sports account?

9  A. Yes.

10 Q. Did you believe this check was fraudulent as well?

11 A. Yes.

12 Q. Did that factor into your decision to put it through a

13 different account?

14 A. Yes.

15 Q. At some point did you learn that this check too had failed

16 to clear?

17 A. Yes.

18 Q. What did you learn?

19 A. I learned it from -- I called my personal banker who I was

20 banking with at Wells -- at Washington Mutual and he informed

21 me that.

22        MR. HOSS: Object to the hearsay, your Honor.

23        THE COURT: Sustained.

24        MS. PERRY: It does go to the state of mind.

25 Q. Turning to Exhibit 65A, the first page of 65A.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

# TRIAL TRANSCRIPT EXCERPT EXHIBIT F

1042

74j6mon2          Wells - cross

1      MR. BARKET:  That is why I said this period.
2   Q.  I don't know if he was born this way, but during this
3   period he was lying?
4   A.  Yes.
5      THE COURT:  Mr. Barket.
6      MR. BARKET:  Sorry.
7   Q.  And he got you to do some things that you otherwise
8   wouldn't have done because he had some leverage over you,
9   right?
10  A.  Never in my life.
11  Q.  But he had some leverage over you, didn't he?
12  A.  Correct.
13  Q.  You don't know what he told other people to get them to do
14  things, do you, because you weren't there?
15  A.  Correct.
16  Q.  I would like to talk to you a little bit about your
17  cooperation agreement.  We will put it up on the screen if we
18  have to, but let me see if I can do did in a way that gets you
19  back to Texas today.
20      You had an opportunity here -- I guess three choices
21  when you were charged with a crime.  See if I am right about
22  this:  You could plead guilty, take your medicine, move on with
23  your life; you could go to trial, get acquitted, get convicted,
24  go on with your life; or the third option was you could
25  cooperate with the government, agree to testify at this trial

1043

74j6mon2          Wells - cross

1  and other proceedings that they request you to plead guilty,
2  that was your third choice?
3  A.  Correct.
4  Q.  You chose that third choice, correct?
5  A.  Correct.
6  Q.  You didn't choose to go to trial because in your mind when
7  you deposited those checks even though no one said to you these
8  are fraudulent, you believed them to be fraudulent, right?
9  A.  Correct.
10  Q.  And you decided not to simply plead guilty and take your
11  medicine, right?
12  A.  Correct.
13  Q.  Because that medicine in your mind would have included
14  prison, a federal prison, correct?
15  A.  Correct.
16  Q.  And that by cooperating with the federal government and
17  testifying, what you are hoping happens there is you avoid that
18  federal prison, right?
19  A.  I have no idea.  Depends what the court gives me.
20  Q.  None of us can see the future, but your hope, sir, the
21  reason why you picked choice number three is that you hope that
22  by cooperating with the prosecutor that you will not have to go
23  to prison or if you do, it will be significantly less than if
24  you had simply pled guilty and taken your medicine, is that
25  true?

# TRIAL TRANSCRIPT EXCERPT EXHIBIT G

1058

74j6mon2          Wells - redirect

1    (In open court; jury present)
2    BY MS. PERRY:
3    Q.  You were asked a number of questions about your motivations
4    in depositing these checks.  Do you recall that?
5    A.  Correct.
6    Q.  You have testified specifically about the leverage that
7    Mr. Montgomery had over you?
8    A.  Right.
9    Q.  Were there any additional reasons, any personal reasons
10   that you also deposited the check?
11   A.  No.
12   Q.  Did you receive any money from the check?
13   A.  No.
14   Q.  Did you hope to?
15   A.  Not really.
16   Q.  Well, did you discuss with Tim Montgomery any any point
17   what money you would make off of the checks?
18   A.  I usually get my percent.
19   Q.  Did you discuss that with Mr. Montgomery?
20   A.  Yes.
21   Q.  And were you hoping you would get a percent?
22   A.  Yes.
23   Q.  Prior to signing a proffer agreement with the government
24   that was just shown to you by Mr. Barket, did you admit to the
25   government prior to that point that you knew the checks you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# TRIAL TRANSCRIPT EXCERPT EXHIBIT H

1035

74j6mon2          Wells - cross

1   is quite a fall, yes?
2   A.  Correct.
3   Q.  And then lo and behold in 2004 and 2005 while
4   Mr. Montgomery is kind of enduring the humility, if you will,
5   of that fall, he comes to you with these checks, yes?
6   A.  Correct.
7   Q.  And as I understand the testimony, he never once said to
8   you this is a bogus check, did he?
9   A.  Correct.
10   Q.  He lied to you, yes?
11   A.  Correct.
12   Q.  It may be a lie that in retrospect you don't believe,
13   didn't believe at the time, but nonetheless it was a lie is
14   that true?
15   A.  Correct.
16   Q.  And he got you to commit ultimately, I guess, the crime you
17   pled guilty to, is that right?
18   A.  Correct.
19   Q.  And you stand here or come before this jury now as someone
20   who has pled guilty to federal bank fraud felony because of
21   what Mr. Montgomery got you to do, correct?
22   A.  Correct.
23   Q.  And it really wasn't that you were doing a friend a favor
24   for Mr. Montgomery, was it?
25   A.  No.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1036

74j6mon2          Wells - cross

1  Q.  It really was in order for you to maintain a relationship
2  with him in order to maintain a relationship with Ms. Jones,
3  yes?
4  A.  More with Ms. Jones.
5  Q.  In other words, you didn't want to alienate the two of them
6  because you were fearful you would lose one of your best
7  clients?
8  A.  I was fearful of losing Marion Jones.
9  Q.  That would be the person -- one of your best clients,
10  correct?
11  A.  Yes.
12  Q.  So Mr. Montgomery had some leverage on you, didn't he?
13  A.  Yeah, he had leverage.
14  Q.  You said something the other day about or yesterday about a
15  track meet and that you said I think on direct examination, I
16  had to use Marion to get him into the meet?
17  A.  Correct.
18  Q.  I think I understand what that means, but whether or not an
19  athlete shows up to a particular event is up to the athlete
20  ultimately, right?
21  A.  Correct.  And the coach.
22  Q.  I am not a track and field person.  It might be obvious but
23  I am not much of a runner or even a walker in the courtroom.
24  Golf is kind if my thing.
25          Tournaments, you know when a golf tournament has Tiger

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1037

74j6mon2          Wells - cross

1   Woods in it, the ratings go up, the sponsorship goes up,
2   everybody makes more money.
3          Is that the same thing in track and field, if Marion
4   Jones showed up to a track and field event that made the event
5   more prestigious and it gave everybody a little bit more money?
6   A.  Correct.
7   Q.  So if Marion Jones decides to go to this event and not that
8   event, the event she decides to go to are happy, thrilled; the
9   event she decides not to go to, not so happy?
10  A.  Correct.
11  Q.  When you say you used Marion Jones, the event that you were
12  speaking about, what was that?
13  A.  Martinique.
14  Q.  That event they didn't really want Montgomery, did they?
15  A.  Correct.
16  Q.  You had to say to them, this is a two-fer, you want Marion
17  Jones, you got to take Montgomery?
18  A.  Correct.
19  Q.  And what did they do?
20  A.  They accepted him.
21  Q.  And in the same way, Montgomery got you to deposit these
22  checks because of your relationship and your desire to maintain
23  a relationship with Marion Jones, is that true?
24  A.  Correct.
25  Q.  In addition to that, as it turns out, Mr. Montgomery was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300